Good morning, your honors. Alexandra Yates on behalf of Mr. Olumuyiwa, and we're asking this court to remand for resentencing because the district court improperly applied two different guidelines enhancements in this case, the vulnerable victim enhancement and the sophisticated means enhancement. And I'd like to address the vulnerable victim enhancement first. We've argued that the district court made several errors with respect to its application of this enhancement, but I think the most important is the court's utter failure to find that Mr. Olumuyiwa knew or should have known that the victims were vulnerable as the court was required to do by the guideline and by this court's precedent. Instead, what the court essentially did was find Mr. Olumuyiwa vicariously liable for the knowledge of his co-conspirators, and that's less than what's required by the guideline and by this court's precedent. So for that reason alone, even if the court has properly validated a class of vulnerable victims and identified the members of that class, and of course we've argued that it didn't, but even if those things had occurred, this court must still remand because the court didn't find the requisite mental state. Second, Your Honors, the district court separately erred in applying the sophisticated means enhancement. Now, we've conceded that the plain language of the literal language of that enhancement does apply to Mr. Olumuyiwa's case, but that's not the end of the story. The problem here is that the unmitigated application of that guideline to Mr. Olumuyiwa's case, where that guideline wasn't intended to apply to facts such as these, has resulted in an unreasonable sentence. And the way we know that the guideline wasn't intended to apply to these facts is first from the Congressional Directive, the Telemarketing Fraud Prevention Act, where it's very clear that Congress was interested in sentencing defendants who used sophisticated means to commit their crimes to higher sentences, presumably that bespoke a greater culpability. And Congress gave us one example of a type of sophisticated means locating an operation abroad in order to conceal it, but that was just an example of the end goal, which was to increase sentences for defendants who used sophisticated means. But they didn't say in that Congressional statement that the defendants had to move or relocate, did they? They did not say that, Your Honor, but what they did say is that they wanted the commission to increase sentences for defendants who were more culpable because they were using sophisticated means. It made law enforcement more difficult. Making law enforcement more difficult could certainly be a valid reason for it. And doesn't operating from a foreign country make prosecution in this country more difficult? Well, it could. In this case, of course, Your Honor, the facts are that this was not an operation that was purely located in the United Kingdom and targeting Americans. It was also targeting victims in the United Kingdom, unfortunately. And so there weren't these problems. I don't think the record reflects that these problems actually did occur. U.K. law enforcement did locate this operation, I think, as far back as maybe 2004. Located Mr. Oluyue. He was certainly cooperative. He reported to law enforcement. He didn't fight extradition. He, once over here, agreed to forfeit any funds that were in U.K. accounts. So the types of problems that that might engender aren't apparent in this case. Your Honor, as I just mentioned, Mr. Oluyue's case doesn't fit into these categories of either increased culpability for using sophisticated means to conceal an operation abroad or alternately the greater harm of having more difficulty with detection of the operation or prosecution of the defendant because they're abroad. And so for those reasons, it was improper for the district court to apply this guideline in a mitigated fashion. Do you know, is there any evidence where, excuse me, he got the list of people to call? No, Your Honor, there's absolutely no evidence. And the district court found and the government conceded in district court that there was no evidence that Mr. Oluyue had any contact with any of the victims. The only evidence was that his role was to manage the bank accounts that received the funds and to manage the mailboxes that also received some of the funds. Did he not receive, in his capacity as banker or whatever he was, I think three payments in a short period of time from one person who was identified? Yes, Your Honor. He received, the evidence was that in a 10-day period, there were three payments received from the same victim. As defense counsel argued in trial court, though, that would be equally indicative of a person making partial payments based on one telephone call. And, of course, the question is whether they were reloaded and asked repeatedly for money. So as that relates to whether Mr. Oluyue should have known that this person was being reloaded, we argued in the district court that it doesn't demonstrate that because Mr. Oluyue easily, equally could have believed they were partial payments on the same request. And the district court, I would argue, implicitly rejected that argument that Your Honor has just raised. Because it was presented in district court and instead of relying on it, the district court took a different approach and found him vicariously liable for the knowledge of his co-conspirators. So in some ways, I would say that the district court has implicitly rejected that argument. What was the name of that person that sent in the three checks? If you just give me one moment, Your Honor, I can tell you. Was it O.P.? It was, yes, it was O.P. And they were three all in March of 2007, and I believe that they were 10 days apart. And what was the name? I missed it. It was just by initials. The initials were O and then P. Initials were used to maintain the confidentiality of the victims. Okay. And unless Your Honor has further questions, I'd like to reserve the balance of my time. Thank you. Thank you. May it please the Court, my name is Ellen Lindsey. I'm an assistant U.S. attorney in Los Angeles, where it's warm. Your Honors, I was trial counsel, and I should tell you also, Dr. Your Honor Holland, that... No, no, no. That was a gag. I've been prosecuting mass marketing cases, mostly against the elderly, from Canada and the United Kingdom for approximately 12 years, and it's really, really hard to do it. And there's almost nobody else in the country who does it because it's so very difficult. And so the fact that the Sentencing Commission and that Congress specifically recognized that there are great difficulties with these... Specifically mentioned these telemarketing cases operating from Canada and other countries and targeting our seniors and other citizens of the United States or residents of the United States and their interests are not being vindicated. And Your Honors, I can get a little hysterical talking about this, so I apologize, but this is the exact kind of case for that enhancement to apply because you have a defendant... That's right. We're used to dealing with crazy lawyers. I get more crazy the older I get, Your Honors. The light in your bathroom is either really bad or I am really looking old. But that's neither here nor there. What's here or there is that... There's some books that you can read. Yeah? Yeah. So anyway, this defendant was prosecuted in the United Kingdom. Well, he was arrested in 2004 and convicted in 2006 and got what they get overseas, which is a slap on the wrist. He got six months. They stopped him or tried to, and he just went right on going and just completely ignored being convicted and sentenced in the United Kingdom. That's what happens in Canada and in the United Kingdom. It doesn't mean anything to them, and that's why this enhancement applies. The Commissioner specifically said there's two different circumstances. One is if they move to evade, and the other is if they're there and it's so difficult for the United States to prosecute. It can take six years to extradite somebody from Canada, and if you're dealing with very elderly victims, they die. And then the defendants in Canada use the fact that the witnesses have all died out to fight their extradition. And then when they get here, the witnesses can be incapacitated because of their age or dead, and it's very hard to prove. But none of that happened in this case, and I'm concerned about whether Ninth Circuit authority really recognizes age plus telemarketing as a class of victim. Well, I was actually addressing that just to talk about why that enhancement, the sophisticated, well, it's called sophisticated means, but it's also specifically offenses over the border. It's other stuff. You know, it's interesting, Your Honor, that there are Ninth Circuit cases that say age alone is not enough, and then there's Ninth Circuit with telemarketing fraud. And then, for example, the Scribner case, they say everybody knows that elderly people are vulnerable to telemarketing fraud. Your Honors, I don't think it's necessary to make a legal ruling about that because the court, the district court itself recognized here. He said, I don't think it's enough, but in this case there are specific facts and victims, and the court did refer to specific victims. And the defendant has not cited in his papers the extent of the district court's reference to the record. I might first want to address the idea that this Luca case has established a need for the district court to name a specific victim. In my practice in my area, I have not seen that as a requirement, and in looking at the Ninth Circuit cases that have cited Luca, it's never been an issue to actually pinpoint somebody. In other words, if the record is clear enough that there are people that fall within the vulnerable victim category that you're talking about, then that is sufficient. And in this case, the record is full of that, but it's not, this court has never required that kind of picayune fact-finding when the record is clear. So in other words, it's always been okay with this court, even after the Luca case, to identify a class of victims and if the record demonstrates that there are that class of victims. In Luca, the record didn't demonstrate that. So with that, let me discuss, first of all, as far as the elderly enhancement goes. In this case, the court actually found, look, I don't think somebody is vulnerable just because they're elderly or else the prosecutor in this case would be vulnerable. That's me. I thought that was funny. Anyway... You're talking to a bunch of old guys. So... If you're going to tell a joke, you have to learn how to pause. Oh. Sorry, Your Honor. Wait for it. Wait for it. Wait for it. Pounce. Pounce. Read Mark Twain's unexpurgated autobiography. I think most lawyers are kind of humorless. No. Anyway, in this case, the court specifically stated, I don't think an elderly person is necessarily susceptible to telemarketing fraud, but the record here demonstrates that these co-conspirators, these co-schemers insinuated themselves into the lives of these people. The court specifically referred, and I think this is something that the defendant does not mention this, but the court specifically referred to my papers and to the pre-sentence report paragraphs, and I can find the specific paragraphs, but the paragraphs in the pre-sentence report where various of the elderly victims are set forth. And in the government's excerpts of record, the interview reports from some of these elderly victims are included. And, for example, GER 18 to 19, victim NH, said that she had no idea dishonest people existed in the world. She grew up in Japan on a hillside where everyone was honest. The court referred to that, which was in my papers. GER 14, victim OP, she gave him her life savings as a retired school teacher. The telemarketer said to her, Do you believe in me? And she had a lot of confidence in him. He seemed concerned when he called. He would ask her about her day. And then victim AF, who was born in 1916, in page 13, stated, Can I ask you something? Yes. Aren't you going beyond the argument that counsel made? I mean, you're just kind of limited. She raises certain issues, right? The public defender, the federal defender, raised certain issues. I remember her talking about this stuff. And when you get up and argue, and rebuttal, you're rebutting what she raised on her oral argument. I think that she stated that the court did not find any specific, A, she stated that the court did not find any specific victims. And the court specifically referred to my papers, which I'm quoting, which are, the court said, I don't think elderly people are necessarily vulnerable, but in this case, as set forth in the government's papers and the PSR, these telemarketers insinuated themselves with vulnerable elderly people. So I was just stating for the court what the specific fact-finding was that the court made or what underlies the facts, whereas the defendant states that the court did not make specific fact-findings. Also, going to the reloading part, one of the things that the defendant argues is that all there is is victim O.P., who sent three payments within 10 days. But the court also refers to the government's papers and to the PSR. And PSR paragraph 21 talks about victim A.F., the victim who was born in 1916, but she is important because of the reloading. She sent payments in June of 06, July 10th, 06, July 25th, 06, and October 23rd, 06. So to the extent the defendant argues that there was no finding other than that this O.P. who only sent payments within a 10-day period, here is victim A.F. who sent these payments over a many months period. But isn't the defendant's argument here that the defendant was simply the banker? He didn't have any way of connecting all of this up because he wasn't talking to the people. Well, the defendant did admit in his factual basis of the plea that he knew what his co-conspirators were doing, and he understood it. And also, Your Honor, he was on notice because he'd previously been arrested and convicted. So if he hadn't been aware of what they were doing, he certainly understood what they were doing once he was arrested and convicted. This was all in connection with the same scheme, but the U.K. only prosecuted for one victim and gave him a slap on the wrist, and then he kept right on going. So at least as of then, he was aware of what was going on. But he did admit in his factual basis that he knew what the crime was about. So the fact that, A, he has knowledge of the type of offense, and that this went on for years, he knew what was going on. And the fact that there are all these payments from the same victim over a long period of time demonstrates the reloading, Your Honor. All right. You know your time's up. Thank you very much, Your Honor. Just to respond to the government counsel's argument, the district court's explanation for the vulnerable victim enhancement is in pages 24 to 25 or 26 of the excerpts of record. The government's papers are only referenced with regards to the overseas enhancement. I'm failing to see where the court specifically cited the government's explanation. Mr. Olumiyiwa did not admit in his plea agreement that he knew anyone was reloaded. I don't even recall from the record any evidence that the one victim identified in the United Kingdom case, although that victim was identified as elderly, was identified as a reloading victim. He specifically reserved his ability to argue that the vulnerable victim enhancement did not apply. I think government counsel made very fact-specific arguments as to perhaps why Mr. Olumiyiwa could have or should have known that there was reloading. The district court rejected those arguments implicitly in coming to a different conclusion. But certainly, at least counsel's argument demonstrates the very fact-based nature of this question, which the district court didn't specifically answer. Instead, the district court took a different tact and said that there was a vicarious liability for the post-perpetrator's knowledge. So certainly this case needs to be remanded for that finding, if anything. As to the record and what's included in the PSR that the court might have relied on, yes, the PSR does list a handful of victims and identify their ages and identify that they're elderly. But as the district court recognized, age isn't enough. And the PSR didn't go beyond that to explain why the ages of these victims made them particularly vulnerable to this particular crime. Well, the judge did make specific reference to multiple payments, and he made specific reference to the report of the probation officer. Why can't we infer from that that he included in his findings the findings in the probation report, particularly given that he adopted the recommendation of the report exactly? I don't disagree that that would be an appropriate holding for this court to make, but I don't think that the PSR tells us everything that we need to know. The PSR does not in any way explain why Mr. Olumuyiwa knew or should have known that any of these victims were elderly. And with respect to reloading, what's located in the PSR is the argument of the three payments that were within 10 days. And as defense counsel mentioned in trial court, that is equally indicative of a person making partial payments on a single request. The PSR also includes what the prosecutor just indicated, the one particular person who made four payments over a period of four or five months. I don't recall whether that's in the PSR. It's paragraph 21. It concerns AF of someplace in California. Well, there was certainly no argument about that in district court. I could make the argument were I in front of the district court to say that a payment stretched over a long period of time when we know that there's at least 50 victims depositing into these bank accounts. There's no evidence as to what the bank in England, what information one sees when deposits are made. It's presumably just a transfer. You know where it comes from, and presumably his job is to keep track of that. Yes, but presumably it's simply a transfer that indicates a payment was made from somewhere in California or some bank in America with more than 50 victims to say that over many months, the defendant should have been aware of precisely who was sending payments multiple times far apart. I think that's at least debatable and is a factual question that the district court would need to answer and didn't answer in this case. As to, Your Honor, Judge Holland's question about whether the Ninth Circuit has already decided that age is itself sufficient, I certainly would concede that there's language in Caterino and Scribner that could be read that way if those cases stood on their own. But the problem is that they don't stand on their own and need to be read in conjunction with this court's other precedent, and that precedent includes Luca. And this court is required to, if possible, reconcile all of those cases. And Luca comes after Caterino. If Caterino said what the proposition here is, that the elderly are presumptively vulnerable to this type of financial fraud, then Luca would have come out differently because the case would have been decided. But Luca doesn't. Luca says that the elderly are not categorically victims of financial fraud such as this. And then Scribner comes after Luca and doesn't purport to overrule it. So I would suggest that the best way and possibly the only way to reconcile these three cases is that Caterino and Scribner are finding that those particular elderly victims were susceptible to those particular frauds but not creating a blanket rule. And I see that my time is up unless the court has further questions. Any questions? Thank you, Your Honor. Thank you very much for the argument. Thank you. Thank you. And we'll call the next matter.
judges: Holland, Pregerson, Clifton